# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 15-00412-01-CR-W-DW |
| Nikolaus Storm Wadlow, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. #25) filed on June 13, 2016, by defendant Nikolaus Storm Wadlow ("Wadlow"). On August 4, 2016 and on September 15, 2016, the undersigned held a two-day evidentiary hearing on Wadlow's motion. Wadlow was present and represented by his counsel, Gerald Gray II. The government was represented by Assistant United States Attorney Bruce Rhoades. At the evidentiary hearing, testimony was given by five witnesses: Detective Troy Schwalm, Detective Eric DeValkenaere, and Sergeant Eric Roeder all with the Kansas City Missouri Police Department, Douglas Glen Aronson, and Wadlow. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. Ex. 1 | DVD/CD of interview |
| Gov't. Ex. 2 | Holiday Inn employee handbook |
| Gov't. Ex. 3 | Acknowledgement of handbook |
| Gov't. Ex. 4 | *Miranda* waiver |
| Def't Ex. 5 | Diagram |
| Def't Exs. 6-26 | Photographs |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT[1]

1. On December 8, 2015, Troy Schwalm was a detective with the Kansas City (Mo.) Police Department and was additionally assigned to the drug task force under the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Tr. at 5-7, 40, 68.

2. On that same day, Det. Schwalm was told by an anonymous source that Wadlow was carrying around a blue duffle bag containing an assault rifle with a collapsible stock and handguns. Tr. at 21, 22, 33, 36.

3. Prior to that date, Det. Schwalm had also obtained information that Wadlow was wanted on a municipal warrant, had a suspended driver's license, and had issues with his vehicle tags. Tr. at 8.

4. Det. Schwalm further had obtained information that Wadlow worked in the maintenance department of the Holiday Inn, One East 45th Street in Kansas City, Missouri, and that he was keeping the weapons on the business premises. Tr. at 8, 15, 32-33, 131.

5. At approximately 9:45 p.m., on December 8, 2015, Det. Schwalm began conducting surveillance of the Holiday Inn looking for Wadlow. Tr. at 8, 37.

6. While conducting the surveillance, Det. Schwalm and other surveillance officers observed Wadlow leave the Holiday Inn around midnight and get into a vehicle. Tr. at 8; Tr.[II] at 9.

7. Det. Schwalm then requested that another officer conduct a traffic stop of Wadlow's vehicle. Tr. at 8.

8. As a result of the traffic stop, Wadlow was taken into custody. Tr. at 8-9.

9. Wadlow's person was searched incident to the arrest and no weapons were found on him. Tr. at 11.

10. Because Wadlow's car was thereby abandoned on a public roadway, Det. Schwalm arranged for the car to be towed for safekeeping. Tr. at 9.

---

[1] In making these findings, the Court has been required to make some credibility determinations, particularly as they pertain to the officers' recitation of the facts surrounding the search and Wadlow's interview and the testimony of Wadlow and Mr. Aronson. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. In the end, the Court concludes that, in general, where there were conflicts, the officers were more credible witnesses – particularly as to whether the locker door was locked or had to be pried open. However, the Court did find Mr. Aronson's testimony regarding the rifle being plainly visible and sticking out of the duffle bag to be more credible than the officer's testimony that they could not recall whether the gun was visible.

11. Prior to the vehicle being towed, Det. Schwalm conducted an inventory of the inside of the vehicle. Tr. at 9.

12. The inventory search of the vehicle yielded a digital scale and some plastic bags that potentially contained illegal drugs. Tr. at 10.

13. No weapons were found in the vehicle. Tr. at 10.

14. Det. Schwalm and two other officers then travelled back to the Holiday Inn and spoke to the manager (Douglas Aronson). Tr. at 11-12, 42, 86, 90.

15. Det. Schwalm told Mr. Aronson that the police had received information that Wadlow was keeping firearms and methamphetamine on the business' premises. Tr. at 14, 90-91.

16. Mr. Aronson then escorted Det. Schwalm and the other officers to the maintenance area of the hotel where Wadlow worked. Tr. at 14, 15, 45.

17. While taking the officers to the maintenance area, Mr. Aronson told them that employees, when hired, are provided an employee manual informing them that their belongings (including lockers and vehicles) are subject to search on the business premises. Tr. at 16, 45, 47, 48.

18. Subsequently, Det. Schwalm obtained a copy of the employee manual as well as Wadlow's signed acknowledgment of the manual. Tr. at 16-18; Gov't Ex. 2; Gov't Ex. 3.

19. Wadlow had read and was aware of the hotel search policy. Tr. at 132-33.

20. Upon arriving at the maintenance area, Mr. Aronson called the general manager of the Holiday Inn (Vickie Jensen) who affirmatively stated to Mr. Aronson that if there were guns or drugs inside the hotel they needed to be removed by the officers and Mr. Aronson should open up Wadlow's workspace. Tr. at 19, 47, 63, 94, 96-97, 111.

21. Based on the conversation with Ms. Jensen, Mr. Aronson consented to a search of Wadlow's workspace. Tr. at 84, 91, 115, 117.

22. Mr. Aronson was not intimidated, harassed, or misled by the officers seeking consent. 117-18.

23. Mr. Aronson then took the officers to the area near the loading dock where maintenance workers had individual closet/office spaces/lockers and opened the door to one of the spaces assigned to Wadlow whereupon the officers saw a blue duffle bag matching the description they had received earlier. Tr. at 20, 21, 52-54, 57-59, 65, 91; Tr.[II] at 4-5, 16, 19, 27-28.

25. Before the bag was even opened, the barrel of a rifle was visibly sticking out of the bag. Tr. at 124-27.

26. Mr. Aronson told the officers to remove any guns from the business premises. Tr. at 125.

27. The officers then entered the space, opened the duffle bag, and saw an SKS assault style rifle with a collapsible stock, extended magazine, and two handguns. Tr. at 22.

28. The bag and its contents were taken by the officers. Tr. at 22-24.

29. Following the seizure of the bag, Det. Schwalm travelled to the Metro Patrol Division stationhouse where Wadlow had been taken in order to interview Wadlow. Tr. at 22.

30. The interview began at approximately 2:00 a.m., about two hours after Wadlow had been arrested (around midnight). Tr. at 25.

31. The interview was conducted in a dedicated interview room at the stationhouse and was both audiotaped and videotaped. Tr. at 26, 28-29; Gov't Ex. 1.

32. At the start, Wadlow was advised of his *Miranda* rights. Tr. at 27.

33. Wadlow informed Det. Schwalm he understood his rights, agreed to talk to the officer, and signed the *Miranda* waiver form at 2:04 a.m. Tr. at 27, 29-30, 69-72; Gov't Ex. 4.

34. Wadlow – who had been arrested before – understood his *Miranda* rights and had "no issues" in signing the waiver form and talking to Det. Schwalm. Tr. at 135-36.

35. At the time of the interview, Wadlow was 24 years old and a high school graduate with 30-40 college credits. Tr. at 146.

36. The ensuing interview lasted approximately 45 minutes during which Wadlow admitted to possession of the handguns and the rifle. Tr. at 27.

## PROPOSED CONCLUSIONS OF LAW

In his motion to dismiss, Wadlow challenges the admissibility of any evidence obtained during the search of his "locker" at the Holiday Inn, as well as the fruits of that search, and the admissibility of any statements made by Wadlow during his interview in the hours after his arrest. Turning first to the search, without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment. *See*, *e.g.*, *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 2000). As protection for citizens from unwarranted government intrusion, the Fourth Amendment generally requires officers to obtain a court-sanctioned search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).

4

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV.  As made clear in the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures.  *Elkins v. United States*, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446 (1960).  As previously noted, in many search and seizure scenarios – particularly where a person's residence is involved – the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant.  In this case, law enforcement officers did not have a warrant to enter or search One East 45th Street, Kansas City, Missouri.  The Supreme Court has cautioned:

> [S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)).  In the present case, the government seeks to justify the entry and search of Wadlow's locker at the Holiday Inn under the consent exception to the warrant requirement.

Even in the workplace, the Supreme Court has recognized that "employees may have a reasonable expectation of privacy against intrusions by police." *O'Connor v. Ortega,* 480 U.S. 709, 716, 107 S. Ct. 1492, 1497 (1987).  To that end, the Court has further reasoned:

> The workplace includes those areas and items that are related to work and are generally within the employer's control, and these areas remain part of the workplace context even if the employee has placed personal items in them.

Id. at 715-16, 107 S. Ct. at 1496-97. However, the Court has also found that an "employees' expectations of privacy in their offices, desks, and file cabinets . . . may be reduced by virtue of

5

actual office practices...." Id. at 717, 107 S. Ct. at 1497. Thus, whether an employee has a reasonable expectation of privacy in his or her workplace must be assessed on a case-by-case basis, "in the context of the employment relation [with an appreciation that an] office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees." Id. at 717-18, 107 S. Ct. at 1497.

In this case, Wadlow's reasonable expectation of privacy in his workplace locker was certainly less than an individual would have with respect to a domicile or residence, but nonetheless, the locker did exhibit some level of privacy (individual assignments, closed door). As such, the Fourth Amendment offered some protection to a search of the locker. Moreover, Wadlow's expectation of privacy was even greater with regard to a personal container, such as a duffle bag. *See*, *e.g.*, *United States v. Davis*, 332 F.3d 1163, 1167–68 (9th Cir. 2003) ("A person has an expectation of privacy in his or her private, closed containers and does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner.").

While the Fourth Amendment broadly requires a warrant when law enforcement officers search a location where an individual has some reasonable expectation of privacy, it is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 1803 (1991). In this case, of course, Wadlow did not consent to a search of workplace. Instead, Mr. Aronson consented to the opening of Wadlow's locker (and, in fact, he personally opened the door). In opposing suppression, the government argues that Mr. Aronson was authorized to consent to the search of Wadlow's locker and, thus, there was no requirement for a warrant.

6

The government has the burden of establishing the effectiveness of Mr. Aronson's consent. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L.Ed.2d 148 (1990)). To meet its burden, the government must demonstrate that Mr. Aronson had either actual or apparent authority to consent to the search. As to the former:

> The consent of one who possesses common authority over [or other sufficient relationship to] premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.

*United States v. Matlock,* 415 U.S. 164, 170-71, 94 S. Ct. 988, 993 (1974). Thus, where there has been "mutual use of the joint property by persons generally having joint access or control for most purposes," third-party consent "recognize[s] that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id*. at 171 n.7, 94 S. Ct. at 993 n.7.

Further, even if a consenting individual did not have common authority over the premises at issue, a warrantless entry based upon third party consent is valid where, at the time of entry, the officers reasonably believed that the third party possessed common authority over premises, even if it becomes later apparent that actual authority to consent did not exist. *Rodriguez,* 497 U.S. at 186-88, 110 S. Ct. at 2800-01; *United States v. Whitfield,* 939 F.2d 1071, 1073 (D.C. Cir. 1991). The government argues that Mr. Aronson had both actual and apparent authority.

Wadlow contends that Mr. Aronson had no actual authority to consent, citing to *United States v. Blok*, 188 F.2d 1019, 1021 (D.C. Cir. 1951) (generally finding that an employer did not have authority to consent to a search of an employee's desk). However, in reaching its conclusion, the *Blok* court noted that the police search of the desk was improper as evidenced by the fact that the employee's "superiors could not reasonably search the desk for her purse, her

7

personal letters, or anything else that . . . had no connection with the work of the office." *Id*. at 1021.

By contrast to *Blok*, Wadlow's supervisors could have searched his private locker. The employee handbook acknowledged by Wadlow contains a specific provision relating to "Locker Rooms and Searches" that states:

> The Company reserves the right to conduct searches to monitor compliance with rules concerning safety of employees, security of Company and individual property, and possession of other prohibited items. "Prohibited items" include illegal drugs, alcoholic beverages, [and] weapons. . . .

In this case, Wadlow's supervisors did have authority to search his workplace locker. Under these facts, the Court concludes that the supervisors had actual authority to consent to search of Wadlow's workplace locker. *Compare United States v. Zhu*, 23 F. Supp. 3d 234 (S.D. N.Y. 2014) (University-employer had actual authority to consent to officers' warrantless search of laptop purchased by defendant-employee since an authorization signed by defendant granted University legal access to laptop).

Moreover, even if Mr. Aronson – in fact – did not possess actual authority to consent, under the totality of the circumstances, the officers acted reasonably in believing that management at the Holiday Inn was authorized to consent to a search of Wadlow's locker based on Mr. Aronson's representations about the employee handbook and his apparent confirming telephone conversation with the hotel's general manager. *Compare Honea v. State*, 15 Ark. App. 382, 695 S.W.2d 391 (1985) (assistant manager of plant where defendant was employed had apparent authority to consent to search of truck cab where he sought advice from his immediate supervisor and dispatcher relayed message that he was empowered to sign release form).

8

However, merely consenting to a search of Wadlow's locker did not necessarily encompass a search of a closed private container in the locker (*i.e.*, the duffle bag). However, the Court finds that once the officers lawfully entered into the locker and saw the duffle bag, the rifle was in plain view. In making this finding, the Court has found the testimony of Mr. Aronson credible on this issue. Mr. Aronson testified on behalf of Wadlow and, with much of his testimony, clearly sought to assist Wadlow's case. Nonetheless, Mr. Aronson was firm in his testimony – despite questioning from the Court and both attorneys – that the rifle was sticking out from the duffle bag. In light of this credited testimony, the Court concludes that the "plain view" doctrine and public safety exception to the warrant requirement authorized the seizure of Wadlow's duffle bag.

Wadlow additionally argues that the statements he made to Det. Schwalm should be suppressed. To that end, the Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S. Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example, the Fifth Amendment:

> does not preclude a witness from testifying <u>voluntarily</u> in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

9

Case 4:15-cr-00412-BCW   Document 50   Filed 11/15/16   Page 9 of 13

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S. Ct. 1814, 1818 (1977) (*emphasis added*).  The touchstone of such Fifth Amendment analysis is voluntariness.  *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness.  The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive.  *Dickerson*, 530 U.S. at 435, 120 S. Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984).  Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624.  Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires.  *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently."  *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1628.

10

However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the burden of proving that the defendant voluntarily and knowingly waived his rights.

*Id.* at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* at 421, 106 S. Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2571 (1979)). These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000), the Eighth Circuit found:

11

> A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 420.

In this case, the statements obtained by the officers were the product of custodial interrogation. However, Wadlow did sign a waiver of his *Miranda* rights. However, Wadlow argues that had he known that he was being investigated for gun charges (instead of a traffic offense) and had he known that Det. Schwalm was also assigned to the ATF, he would not have signed the waiver. Even accepting as true Wadlow's contention, however, this does not establish that his waiver was involuntary. The evidence before the Court sufficiently establishes that Wadlow's waiver was a product of a free and deliberate choice. It is well-settled that a defendant's decision to waive his Fifth Amendment privilege against self-incrimination may be voluntary, even if the defendant is not aware that he would be questioned about a separate crime. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 857 (1987) (waiver was voluntary even where defendant alleged "the police failed to supply him with certain information" about other crimes for which he was being investigated). The Court finds that the waiver was voluntarily made. As such, suppression of any statements is not required.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. #25) filed on June 13, 2016.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and

serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

>  */s/ John T. Maughmer*  
> **John T. Maughmer**  
> **United States Magistrate Judge**